UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLES REDDEN, | § | |
| CHRISTOPHER BROOKS, | § | |
| BRAD KESSLER AND | § | |
| CHARLES REDDEN AND | § | |
| ASSOCIATES, INC. | § | |
|     PLAINTIFFS | § | |
| | § | |
| V. | § | CAUSE NO. 3:09-CV-1380-L |
| | § | |
| | § | |
| | § | |
| SMITH & NEPHEW, INC. | § | |
|     DEFENDANT. | § | |

## PLAINTIFFS CHARLES REDDEN, CHRISTOPHER BROOKS, BRAD KESSLER, AND CHARLES REDDEN AND ASSOCIATES, INC.'S SECOND AMENDED ORIGINAL COMPLAINT

1.    Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc.'s file this Second Amended Original Complaint against Defendant Smith & Nephew, Inc. and, for cause, would respectfully show unto the Court as follows:

### A.  INTRODUCTION

2.    Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc. [collectively "Plaintiffs"] were sales representatives for Defendant Smith & Nephew, Inc. ["S&N"].

3.    S&N is a British company with a United States operation based out of Memphis, Tennessee.  S&N is in the business of supplying medical instruments and products to orthopedic surgeons and hospitals for orthopedic procedures and operations; primarily knee and hip

replacements. In 2008 S&N made a gross profit of $2,720,000,000.00, a margin of more than 70%.

4.     On or about June 12, 2009, S&N terminated Plaintiffs as sales representatives without providing a reason.

## B. PARTIES

5.     The individual Plaintiffs are residents of Dallas County, Texas, and the corporate Plaintiff Redden and Associates, Inc. is a Texas corporation with its principle place of business in Dallas County, Texas.

6.     Defendant S&N is a foreign corporation registered to do business in Texas and has appeared.

## C. JURISDICTION AND VENUE

7.     This Court has diversity jurisdiction pursuant to 28. U.S.C. §1332; as there is complete diversity of citizenship between the Plaintiffs and Defendant.

8.     Venue is properly placed in this District according to 28 U.S.C. § 1391 (b) & (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, a substantial part of the property that is the subject of the action is situated in this District, and the Defendant is subject to personal jurisdiction in this District.

## E. FACTUAL BACKGROUND

### i. Plaintiffs' relationship to S&N

9.     In April 2000 S&N entered into a Sales Representative Agreement with Charles

Redden. The "Redden Agreement" is attached hereto as Exhibit A. At that time, S&N provided Redden with a representative number to track his sales and to pay Redden his commissions. In November 2000, Charles Redden ["Redden"] created Redden and Associates, Inc. ["Redden and Associates"] and he gave notice to S&N of his corporate entity. S&N accepted the corporate entity and began paying Redden's commissions to Redden and Associates, the representative number remained the same.

10.    In April 2004, Christopher Brooks ["Brooks"] began work as a Sales Representative for S&N. Like Redden, S&N assigned Brooks a particular representative number to pay commissions. In February 2008, Brooks joined Redden and Associates.

11.    In February 2008, Brad Kessler ["Kessler"] began work as a Sales Representative for S&N. Shortly after Kessler associated with S&N, Kessler joined Redden and Associates.

12.    S&N approved Brooks and Kessler's transfer to Redden and Associates. Brooks and Kessler continued to represent S&N products.

13.    Further, beginning in 2008, S&N provided Redden and Associates a 1099 that included all commissions related to the collectively earned commissions by Redden, Brooks and Kessler. Further, S&N's corporate treatment included:

 a. Since February 2008, S&N sent commission checks to Redden and Associates, made payable to Redden and Associates, for Redden, Brooks and Kessler commissions. Since February 2008, neither Brooks nor Kessler ever received another commission check from S&N;

 b. When Redden, Brooks or Kessler handled a "case," [that is, Redden, Brooks or Kessler provided a S&N orthopedic product to a surgeon (which sometimes required technical assistance) for a patient] Redden, Brooks or Kessler would submit a purchase order, and any other required documentation, under the Redden and Associates' sales representative number; and

**Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc.'s Second Amended Original Complaint**     Page 3

c. All of Redden, Brooks and Kessler's S&N sales were accounted for under a single account number; the Redden and Associates' representative number.

### ii. Deferred Prosecution Agreement

14. In March 2005, the New Jersey U.S. Attorney began an investigation into a kickback scheme by the orthopedic industries' leading players in joint replacement, which included S&N. The kickback scheme was to put doctors on the company's dole as "consultants" for their products; however, the pay for these "consultations" typically went to the high-end user as a form of kickback for their product loyalty and high usage. "Consultations" were not designed to improve the product or to legitimately collect data but to provide additional money to surgeons for product loyalty.

15. In September 2007, S&N, and other orthopedic-joint giants, paid collectively $310,000,000.00 in penalties, agreed to work with Department of Justice monitors, and entered in to a formal "Deferred Prosecution Agreement," ["DPA"]. The DPA required S&N to follow AdvaMed guidelines as well as rules of conduct created by S&N. S&N also established a Compliance office to enforce the guidelines and rules.

16. The AdvaMed guidelines provided that interaction with surgeons should be "professional in nature" and "should not provide or pay for any entertainment or recreational event or activity." However, there is no violation of AdvaMed guidelines if the surgeon pays for his/her own meal/entertainment. Additionally, AdvaMed prohibits providing surgeons with activities such as the "theater, sporting events, golf, skiing, hunting, sporting equipment, and leisure or vacation trips." AdvaMed also provided that the setting should be conducive to "bona fide scientific, educational or business discussions." Under the AdvaMed guidelines, dinner with a surgeon is an appropriate activity.

**Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc.'s Second Amended Original Complaint** Page 4

17.     S&N's Code of Conduct and Business Principles stated that "you must report any breach of this code of conduct that you discover," and the failure to report may result in "disciplinary action against you, which could include your employment."  To implement this, S&N provided an anonymous hotline and an anonymous email, through SilentWhistle, for anonymous reporting of misconduct.  However, S&N's reporting system contradicts its purpose; S&N *requires* reporting of code violations and provides for anonymous reporting, presumably to protect the one making the report from retaliation, but S&N has the right to terminate someone for not reporting code violations.  For example, if someone reports a code violation anonymously, that person could be terminated by S&N for not identifying themselves as the anonymous reporter.  S&N's anonymous reporting is illusory.

18.     In March 2009, S&N's obligations under the DPA expired.

### iii. The Incident

19.     In April of 2009, Plaintiffs were advised by north Texas S&N District Manager Jon Hebel ["Hebel"] that S&N's President Andrew Holman ["Holman"] and S&N's Regional Vice-President Shawn Gabriel ["Gabriel"] were travelling to Dallas to meet with sales representatives and to take to dinner some of the physicians who used S&N products.  In particular, Kessler was asked by Gabriel to invite a certain surgeon to dinner.  Interestingly, Hebel instructed Plaintiffs not to mention or discuss via email post-dinner activities that Hebel was planning; this way there would be no written record.

20.     Holman joined S&N in October 2005 as a Vice-President and was later promoted to president of S&N's U.S. division in April 2008.  Holman quickly earned a reputation that he was not someone to be crossed or criticized; he also earned a reputation for partying and men's

clubs. It was well known within the ranks of S&N that Holman would skirt the rules and that if he did it, it was OK.

21.     Shortly after Hebel's contact with Plaintiffs, Holman and Gabriel arrived in Dallas. Gabriel, the Regional Vice-President, took the surgeon to dinner with Kessler; where the conversation was professional and business like. Gabriel paid for the surgeon's dinner with his S&N credit card. Then, as Hebel had planned, the surgeon was invited to the Ghost Bar at the W Hotel to meet Holman; the doctor accepted.

22.     Holman, Gabriel, Hebel, the surgeon, and Plaintiffs met at the W Hotel Bar and had drinks. After two rounds of drinks, Holman suggested that the group go to the Lodge, a gentlemen's club. Gabriel paid for the entire bar bill at the W Hotel and they left for the Lodge. On this occasion, as in other times, Plaintiffs expected the surgeon to pay for his entertainment [drinks] at the Lodge; the surgeon was well aware of AdvaMed guidelines.

23.     At the Lodge, Holman ordered a couple rounds of drinks; Plaintiffs arrived later and had a separate bar bill [the "Evening"]. After about an hour, the Evening ended. Plaintiffs did not know who paid for the surgeon's drinks.

24.     During the Evening, Plaintiffs did not violate AdvaMed; they did not pay for any "entertainment" for the physician and AdvaMed does not require reporting of known misconduct. In fact, by the end of the Evening, Plaintiffs were not concerned about the night's activities because they were with the president and Regional Vice-President who Plaintiffs believed were aware of AdvaMed guidelines and S&N's codes and could distinguish what was acceptable activity from what was prohibited. Even at that, none of the Plaintiffs believed it would be a good career move to report the President and Vice-President; especially for an

**Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc.'s Second Amended Original Complaint**                    **Page 6**

Evening that was planned by S&N's top brass.

### iv. The Aftermath

25.    Within a few weeks, S&N's Compliance office opened an investigation into the Evening; an Evening that S&N's district manager Hebel knew or suspected would involve AdvaMed violations by S&N's top officers.

26.    Once the "investigation" became known, Plaintiffs were sought out by Holman and Gabriel. Plaintiffs were instructed by Holman and Gabriel to *deny the Evening ever occurred* to S&N's Compliance office. In particular, Holman pulled Plaintiff Brooks aside during S&N's President's Club Trip in Cabo, Mexico. Holman told Brooks "they [S&N Compliance office] know what happened [the Evening in question]." Brooks replied "what is the big deal;" Brooks knew neither he nor his partners purchased anything for the surgeon so there should not be a problem for the Plaintiffs. Holman responded "I, Holman, could get fired . . . are you gonna *play ball*, if we *all* have the same story, nothing will happen." This instruction delivered the message to Plaintiffs that their positions with S&N were jeopardized regardless of which side they chose. The one thing Plaintiffs knew for sure, Holman was still the President, he held their careers within his authority, and he was not to be trifled with.

27.    The "instructions" did not end there, Vice-President Gabriel told Plaintiff Kessler to "deny anything happened that night" and made assurances that this matter would go away if Plaintiffs followed their instructions. These instructions made Plaintiffs nervous and concerned for their careers, and Holman and Gabriel knew that.

28.    In late May 2009, Plaintiffs were advised by Hebel to contact Compliance about the evening in question; Hebel had previously instructed Plaintiffs that the "Evening never

**Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc.'s Second Amended Original Complaint**                    Page 7

existed." It is believed Hebel originally denied the Evening occurred, as instructed by Holman and Gabriel, when Hebel was first contacted by S&N Compliance, but a few weeks later he changed his mind, or had it changed for him, and told Compliance what he knew. Significantly, Hebel kept his job with S&N despite being one of the architects and participants of the Evening in question. This shows that but for the **instructions** by Holman and Gabriel, Plaintiffs would be working for S&N today if they had been **free** to talk with the S&N Compliance office; a freedom denied to them by S&N's President and Vice-President.

29.     The knowledge and content of S&N's investigation into the Evening spread like wild fire throughout the north Dallas S&N sales representative ranks. This validated Plaintiffs concerns that if they cooperated with S&N's Compliance office that Holman and Gabriel would find out.

30.     Then, in an astonishing vindication of Plaintiffs' concerns over confidentiality, in May 2009, a former S&N sales representative learns about the Evening and confronts Holman in a Dallas parking lot about the Evening in question. The former sales representative learned of the evening as the story spread through north Dallas and he believed he had Holman compromised.   Clearly, Holman feared this information being reported.   Holman made arrangements for the former sales representative to be paid off by S&N.

31.     On June 12, 2009, Plaintiffs Kessler and Brooks were called into S&N's Dallas office and each was terminated; Redden was terminated too.  S&N gave no reason for the terminations other than S&N could terminate Plaintiffs at S&N's pleasure.

### v. Following Termination

32.     To add to the measure of humiliation and injustice that S&N placed upon

**Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc.'s Second Amended Original Complaint** Page 8

Plaintiffs, S&N's Southern Region Technical Sales Director Jim Berger defamed the Plaintiffs by publishing false statements about Plaintiffs. In particular, sometime between late May to June 2009, Berger told surgeon Stephen Weeden, MD, in his office, that "Redden, Brooks and Kessler regularly violated AdvaMed to get business." Upon information and belief, Berger published this same statement, or very similar, to numerous surgeons, in their offices, in the Dallas area. These false claims were made with malice or negligence regarding the truth and have slandered, disparaged and defamed Plaintiffs and caused damages to their reputations.

### vi. Damages

33.     As a result of S&N's actions, Plaintiffs were terminated from their careers that they had spent years developing and learning S&N products.[1]  Plaintiffs were not paid commissions on the products they had sold nor were they paid commissions on products that were ready for sale through scheduled surgeries. Further, each Plaintiff has had to seek new positions, learn new products, develop new customer bases, and explain why they were terminated. Their careers have been damaged, their reputations have been tarnished, and they have lost time, money, and incurred attorney fees.

### vii. Vice-Principal

34.     Holman and Gabriel were corporate officers of S&N at all times relevant to the issues in this case; in particular, in planning and attending the Evening, in paying for the surgeon's dinner, entertainment and drinks, and when instructing the Plaintiffs to claim the "evening never happened." Holman and Gabriel also had the authority to employ, direct and discharge employees and independent contractors and Holman and Gabriel managed the business

---

[1] Charley Redden's wife was nine months pregnant at the time S&N terminated him; a fact well known by S&N.
**Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc.'s Second Amended Original Complaint**                          Page 9

of S&N. As such, Holman and Gabriel were vice-principals of S&N; therefore, the actions of Holman and Gabriel, as vice-principals of S&N, are considered the actions of S&N itself. A corporation is directly liable for the torts or contracts executed by its vice-principals.

## F. CAUSES OF ACTION

### Count One–Breach of Contract

35.     Plaintiff Redden/Redden and Associates incorporate by reference all paragraphs above as if set forth verbatim herein.

36.     The Redden Agreement by and between Redden and S&N was the agreement that set forth the terms under which Plaintiff Redden/Redden and Associates were paid commissions from S&N for the sales activities related to a particular sales representative number. See Exhibit A, Section 4(b).

37.     S&N breached the Redden Agreement, Section 4(b), by failing to pay Plaintiff Redden/Redden and Associates for earned commissions [approximately $30,000[2]] following the termination of the contract. The Redden Agreement states that commissions are to be paid upon invoicing, which was done by Redden, and does not provide S&N the right to withhold earned commissions; irrespective of whether the contract is terminated or not. The approximate $30,000 in unpaid commissions were invoiced in April, May and/or June 2009.

38.     As a direct result of S&N's breaching the Redden Agreement, Plaintiff Redden/Redden and Associates have been damaged by S&N's failure to pay invoiced commissions, of approximately $30,000, that are due and owing.

39.     Additionally, pursuant to Tex. Civ. Prac. & Rem. Code § 38.01 et seq., Plaintiff

---

[2] The actual unpaid commission is known only by S&N.

Redden/Redden and Associates are entitled to recover their reasonable attorneys' fees. Plaintiff Redden/Redden and Associates presented the above-described claim to S&N more than thirty (30) days before filing this action. At the time of filing the Original Complaint, payment for the just amount owed had not been tendered by S&N.

### Count Two–Breach of Contract

40.     Plaintiffs Redden/Redden and Associates incorporate by reference all paragraphs above as if set forth verbatim herein.

41.     The Redden Agreement by and between Plaintiffs Redden/Redden and Associates and S&N was the agreement that set forth the terms under which the parties could terminate their contractual relationship.

42.     S&N breached the Redden Agreement, Sections 4(b) and 7(a), by terminating Plaintiffs Redden/Redden and Associates for, allegedly, cause, when no cause existed for termination under the Redden Agreement. The agreement states eleven definitions for cause but none of these "causes" matches the facts alleged herein. As a result of the termination, Plaintiffs Redden/Redden and Associates were damaged by the loss of commissions properly tendered to S&N through invoices [approximately $30,000], loss of earned but un-invoiced commissions [approximately $60,000], and commissions lost during the time Redden and Associates were unable to earn commissions because of no other sales representation relationship caused by S&N's termination [approximately $150,000]. The $30,000 in unpaid commissions and $60,000 in un-invoiced commissions was earned in April, May and/or June 2009. The $150,000 in lost commissions was for June, July, August and September 2009.

43.     As a direct result of S&N's breaching the agreement, Plaintiff Redden/Redden and Associates have been damaged by this breach, which includes damages for lost and invoiced commissions, approximately $30,000, commissions earned but not invoiced, approximately $60,000, and commissions that would have been earned but for termination, approximately $150,000.

44.     Additionally, pursuant to Tex. Civ. Prac. & Rem. Code § 38.01 et seq., Plaintiffs Redden/Redden and Associates are entitled to recover their reasonable attorneys' fees. Plaintiffs Redden/Redden and Associates presented the above-described claim to S&N more than thirty (30) days before filing this action. At the time of filing the Original Complaint, payment for the just amount owed had not been tendered by S&N.

### Count Three- Defamation

45.     Plaintiffs incorporate by reference all paragraphs above as if set forth verbatim herein.

46.     S&N, through its agent Jim Berger, published false statements of fact that referred to Plaintiffs and defamed Plaintiffs, see paragraph no. 32.   The identified statement was defamatory towards Plaintiffs and was negligently or maliciously made regarding the truth of the statement.

47.     S&N made these statements without regard for the truth, acting with malice, and Plaintiffs have suffered pecuniary injury.

### G. JURY DEMAND

48.     Plaintiffs demand a trial by jury on all issues so triable.

49.   By filing this lawsuit, Plaintiffs do not waive or release any rights, claims, causes of action, or defenses or make any election of remedies that they have or may have, but expressly reserves such rights, claims, causes of action and defenses.

50.   All conditions, precedent to the institution of this lawsuit, have been performed, have occurred or have been waived.

**WHEREFORE,** Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Redden and Associates, Inc., respectfully requests that they be granted judgment as requested herein and recover all costs, damages, and exemplary damages, as well as reasonable and necessary attorneys' fees, together with all other and further relief, both at law and in equity, to which Plaintiffs may show himself to be justly entitled.

Respectfully submitted,

**SHAVER LAW FIRM, PLLC**

By:   s/Steven R. Shaver
      **Steven R. Shaver**
      State Bar No. 18136550
      301 Town East Tower
      18601 LBJ Freeway
      Mesquite, Texas 75150
      (214) 295-2901 (Telephone)
      (214) 432-6688 (Telecopier)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon counsel who have so registered with the Court via the Court's ECF system, and are considered served pursuant to the Administrative Procedures incorporated into the Order Adopting Administrative

**Plaintiffs Charles Redden, Christopher Brooks, Brad Kessler, and Charles Redden and Associates, Inc.'s Second Amended Original Complaint**                    **Page 13**

Procedures for Electronic Case Filing, General Order 2003-01-01.2

s/ Steven R. Shaver

# SALES REPRESENTATIVE AGREEMENT

THIS AGREEMENT is effective April 3, 2000 and is by and between **Smith & Nephew Orthopaedics, a division of Smith & Nephew, Inc.,** a Delaware corporation, 1450 Brooks Road, Memphis, Tennessee 38116, (hereinafter "S&N"), and **Charles Redden,** 6041 Prospect Ave., Dallas, TX 75206 (hereinafter "Sales Representative").

WHEREAS, S&N manufactures, distributes and/or supplies medical devices, including instruments, implants and supplies, to the medical trade; and

WHEREAS, Sales Representative is in the business of soliciting sales of products, including medical devices such as instruments, implants and supplies, to the medical trade; and

WHEREAS, S&N desires to appoint Sales Representative as an independent representative for the solicitation of sales of the orthopaedic product lines indicated in Appendix 1 hereto, and Sales Representative desires to be an appointed independent representative for the solicitation of sales of Products;

NOW, THEREFORE, in consideration of the premises and covenants herein contained, the parties hereto agree as follows:

1.  Appointment of Sales Representative.  S&N hereby appoints and Sales Representative hereby accepts the appointment as the independent representative of S&N for the solicitation of sales of Products (as herein defined) for the territory designated.  Sales Representative shall not sell or solicit sales of products or otherwise represent companies selling or otherwise distributing products competitive to S&N's products without prior written approval from S&N.  S&N shall have the sole right to make the determination of those products which are competitive to S&N's products.  Subject to the terms of this Agreement, Sales Representative is free to engage in any other activities he wishes.

    S&N reserves the right to sell directly to national, regional or governmental accounts.

2.  Territory and Products.  The term "Products" as used in this Agreement refers to the orthopaedic product lines identified in Appendix 1 hereto (hereinafter "Products").   Whether Sales Representative's appointment is exclusive or non-exclusive with respect to any individual product line is shown in Appendix 1.  S&N may add and/or delete items from such Appendix to reflect changes to the lines of Products offered for sale generally by S&N.

    The territory within which the Sales Representative shall solicit sales of Products shall be the geographical area and/or account listing shown in Appendix 2 hereto (hereinafter "Territory"); provided, however, that S&N reserves the right to revise the Territory as necessary.

3.  Sales Representative's Duties and Obligations.

    (a)  Sales Representative shall promote Products and solicit orders for sales of Products within the Territory.

# Exhibit A

(b) Sales Representative shall ensure the filing of all appropriate business registrations, and compliance with the requirements of tax withholding and reporting.

(c) In order to comply with applicable law and in order to protect S&N from claims and liabilities, Sales Representative's communications and representations to customers shall be true, accurate, complete and consistent with the labeling of Products. Sales Representative shall in no circumstances modify, repackage, adulterate, misbrand, alter or add labels to or remove labels from any of Products. Sales Representative shall take no action or issue any statement which is or could be detrimental to the reputation and goodwill of S&N.

(d) All advertising and all participation by Sales Representative in public exhibitions, relating to Products and the use of S&N's name and trademarks, shall be subject to prior written consent of S&N, which consent shall not be unreasonably withheld.

(e) Except as otherwise agreed, Sales Representative shall be responsible for providing his own equipment, offices, working facilities, and such other facilities and services as may be required at his own expense; provided, however, that Sales Representative shall maintain an inventory of demonstration equipment, deliverable Products and instrument kits (hereinafter "Inventory") to promote and solicit orders for Products. Sales Representative shall be responsible for the risk of loss or damage of such Inventory owned by S&N whether or not held at Sales Representative's business location. Upon termination of this Agreement, Inventory shall be returned to S&N.

(f) Sales Representative shall submit an annual comprehensive Business Plan and quarterly update reports addressing each section of the Business Plan.

4. S&N Duties and Obligations.

(a) S&N shall sell Products on orders solicited by Sales Representative in accordance with published price lists and currently in effect. Written notice of changes to the price lists shall be given by S&N to each Sales Representative at least thirty (30) days in advance of the implementation of such changes. S&N may accept or refuse any order for Products and will not be bound by any order until it is finally accepted by S&N. S&N shall not be liable for any loss or damage caused by non-acceptance of orders or delays in making shipments.

(b) S&N shall pay to Sales Representative a commission at the percentages shown on Appendix 3 on orders solicited within and delivered to the Territory, beginning April 3, 2000. Commissions shall be deemed earned by Sales Representative upon invoicing of Product sales by S&N to customers. Commissions earned by Sales Representative shall be computed on the net amount of the invoices rendered (less credit memos) in accordance with published price lists for each order or part of an order, exclusive of all freight and transportation costs (including insurance), normal and recurring bona fide trade discounts having S&N's prior approval and any applicable sales or similar taxes. S&N shall withhold from commissions paid a base reserve against bad debts, accounts receivable and

Inventory. In the case of bad debts, S&N shall charge the Sales Representative back for the commissions previously paid . In the event that Sales Representative continues to deliver order Product to an account on credit hold, S&N will reserve the right to charge back against Sales Representative's commission the entire amount of the unpaid invoice.

Sales Representative is not guaranteed a minimum commission or a minimum compensation. There is no assurance that Sales Representative will not incur a loss hereunder.

(c) S&N shall deduct from the commissions otherwise due the Sales Representative an administrative support fee, as detailed in Appendix 4. The fee will be utilized to cover the expense of providing the Sales Representative descriptive literature, promotional materials, catalogs, office space, secretarial support, loaner instrument and implant access, courier services, and any other general support services.

(d) S&N shall make a good faith effort to collect monies owed on invoices from orders solicited by Sales Representative.

5. Confidentiality, Improvements, Patents, and Trademarks.

(a) Sales Representative shall take all reasonable steps and do those things reasonably necessary to ensure that confidential information relating to the Products and to the technology and business of S&N is not disclosed or made use of outside the business of Sales Representative and S&N; provided, however, that the foregoing shall not apply to information (a) which be can shown to be in writing and known to Sales Representative prior to disclosure by S&N; (b) which is or becomes public knowledge through no fault of Sales Representative; or (c) which is disclosed to Sales Representative by a third party with the lawful right to make such disclosure.

(b) Sales Representative shall submit to S&N all ideas concerning Products which Sales Representative receives from customers during the term of this Agreement. Further, all product ideas developed or discovered by Sales Representative are and shall remain the sole property of S&N because S&N has provided Sales Representative with special knowledge and has placed Sales Representative in a position to formulate ideas concerning Products. Sales Representative prospectively assigns such ideas to S&N and hereafter shall acquire no right or interest in such ideas. Within a reasonable time, not to exceed one (1) year, S&N shall evaluate the idea and shall reassign rights to the idea to Sales Representative, at Sales Representative's request, if S&N elects not to develop the idea commercially.

(c) Sales Representative acknowledges that any and all of the trade secrets, ideas and information, research, methods, improvements, patented or copyrighted material relating to present or future Products or S&N's business, and the goodwill associated with them, are owned by S&N, are provided or revealed to Sales Representative in trust and confidence, and are and shall remain the sole and exclusive property of S&N. All such information and knowledge about S&N and the products, services, standards, specifications, procedures and techniques which are not in the public domain or generally known in the industry and such

other information and material as S&N may designate as confidential shall be deemed confidential for the purposes of this Agreement. Sales Representative shall not, during and after the termination of this Agreement, copy or disclose to any other person, or use for any purpose other than as contemplated by this Agreement, any of the confidential information or trade secrets.

(d) The above provisions of this Section 5 shall survive the termination of this Agreement.

(e) S&N hereby grants Sales Representative a royalty-free right to use S&N's trademarks and identification on and in connection with the solicitation of orders for Products during the term of this Agreement. Sales Representative shall discontinue the use of all such trademarks upon the termination of this Agreement. All goodwill generated hereunder in the use of such trademarks shall accrue to the benefit of S&N and Sales Representative hereby disclaims any rights in S&N's trademarks and identification other than the aforementioned license.

6.  Term of Agreement. This Agreement shall commence on April 3, 2000 and continue in full force and effect until December 31, 2000. This Agreement shall automatically renew for an additional term of twelve (12) months through December 31, 2001, if S&N fails to notify Sales Representative of its intention not to renew this Agreement by December 1, 2000. Alternatively, this Agreement may be terminated at any time by the mutual written agreement of S&N and Sales Representative, or in accordance with the provisions of Section 7 below.

7.  Termination.

(a) The following actions by or events involving Sales Representative shall each constitute a material breach of this Agreement and give S&N an immediate right to terminate this Agreement:

(i)  Conviction of Sales Representative of a felony; or

(ii)  Involuntary bankruptcy which is not terminated within sixty (60) days, insolvency or voluntary bankruptcy; or

(iii)  Sales activities in violation of applicable law, misrepresentation, misbranding or adulteration of any of S&N's products or any action or statement which is or could be detrimental to the reputation and good will of S&N; or

(iv)  Engaging in any practices or making any representations to any customer which are misleading, incomplete, fraudulent, untrue or contrary to the terms of the Sales Representative Agreement; or

(v)  Selling or invoicing products requesting or requiring customer payment to the Sales Representative; or

(vi)   Engaging in any practices which are contrary to the Sales, Marketing and Promotional Practices Policy for Smith & Nephew Companies in the United States; or

(vii)   Selling Company products to parties who use, resell or distribute such products outside the United States; or

(viii)   Failure to attend required meetings; or

(ix)   Failure to retrieve Product as called for during product retrievals; or

(x)   Engaging in the sale of products, or the solicitation of orders for products, competitive to those of the Company, or competitive to those of Smith & Nephew, Inc. (including, but not limited to, Smith & Nephew Endoscopy, Smith & Nephew Casting, Smith & Nephew Wound Management, Smith & Nephew ENT, Smith & Nephew Rehabilitation, or any other company subsequently acquired); or

(xi)   Misuse of S&N's confidential information.

(b) Either party may terminate this Agreement, with or without cause, by giving the other party written notice of its desire to terminate.

8. <u>Force Majeure</u>.  Obligations of either party to perform under this Agreement shall be excused during such period of delay caused by matters such as strikes, shortages of power or raw materials, government orders, or Acts of God, which are reasonably beyond the control of the party obligated to perform.

9. <u>Notices</u>.  Any notice required by this Agreement shall be deemed sufficient if sent by a) hand delivery, b) certified mail, postage prepaid, c) by Federal Express or other similar nationally recognized overnight delivery service providing proof of delivery, to the party to be notified at the address set forth below, until a different address is supplied in writing.

(a) In the case of S&N, such notice shall be sent to:

Smith & Nephew Orthopaedics
1450 Brooks Road
Memphis, Tennessee 38116
Attn: Sr. Vice President, U.S. Sales

with a copy to:

Smith & Nephew, Inc.
1450 Brooks Road
Memphis, Tennessee 38116
Attn: General Counsel

(b) In the case of Sales Representative, such notice shall be sent to the address shown on the first page of this Agreement.

10. Entire Agreement. This document and the incorporated references represent the entire agreement between the parties hereto, and supersede all prior agreements regardless of their terms or cancellation provisions, and this Agreement shall be modified only by a written agreement signed by S&N and the Sales Representative.

11. Applicable Law. This Agreement shall be governed by the laws of the State of Tennessee as applicable to contracts made and to be performed in that state.

12. Assignability. This Agreement shall not be assigned either by the parties or by operation of law without the prior written consent of the other party; however, in the case of S&N, S&N may, without obtaining the consent of the Sales Representative, assign its rights and obligations under this Agreement to any corporation with which S&N may merge or consolidate or to which S&N may transfer substantially all of its assets.

13. Severability. If a court of competent jurisdiction finds any provision of this Agreement invalid or unenforceable, such provision shall not affect the remainder of the Agreement which shall otherwise remain in full force and effect.

14. Non-Compete. Sales Representative agrees that, during the term of this Agreement, it shall serve the customers of S&N in a representative capacity only, and shall not act on behalf of any competition of S&N, and that on termination, expiration, or nonrenewal of this Agreement for any cause or reason whatsoever, or without cause, Sales Representative shall not, for a period of twelve (12) months thereafter:

(a) Call upon, solicit, service, interfere with, or divert in any way customers served by S&N in the Territory; or

(b) Engage in or be employed in any business (in the Territory) substantially similar to the business of S&N.

15. Fraud and Abuse. Sales Representative shall (a) comply with all applicable fraud and abuse laws and with the policies of Smith & Nephew, Inc., including but not limited to Appendix 5 hereto, as it may be amended from time to time; (b) indemnify S&N for any damages S&N suffers due to Sales Representative's violation of the policies of S&N; and (c) cooperate in S&N's investigations relating to sales representative activities, including investigations relating to fraud and abuse issues.

16. Relationship. This Agreement shall not be construed to create between the parties hereto the relationship of principal and agent, joint venturers, partners, employer and employee, franchisor and franchisee, manufacturer and distributor, or any other similar relationship, the existence of which is hereby expressly denied by each party. This Agreement does not establish a franchise of any type. The parties hereto agree that the Agreement shall not be subject to and expressly waive application of any franchise laws that may exist in any jurisdiction. Neither party shall

have any authority to bind the other, and neither party shall be liable to any third party in any way for any engagement, obligation, contract, representation or transaction. Sales Representative is an independent contractor engaged in its own and entirely separate business.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

SMITH & NEPHEW ORTHOPAEDICS
a division of
SMITH & NEPHEW, INC.

CHARLES REDDEN
Social Security No. _____

By: _____
    Sr. Vice President, U.S. Sales

_____

Date: _____

Date: 5/17/00

By: _____ FOR Al Nawaz
    Director of Regional Sales

Date: _____

Appendices:
1. Products
2. Territory
3. Commission Schedule
4. Administrative Support Fee Schedule
5. Fraud and Abuse

## APPENDIX 1

## PRODUCTS

<u>X</u>       Trauma

<u>X</u>       Hips

<u>X</u>       Knees

<u>X</u>       Cement / Shoulder